IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MORRIS JERMAIN THOMAS, ) <br> ) <br> Plaintiff, ) <br> vs. ) <br> ) <br> CYNTHIA STEWART, ) <br> ) <br> Defendant. ) | CIVIL ACTION NO. 1:20-0302-JB-MU |

### REPORT AND RECOMMENDATION

Plaintiff Morris Thomas, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). This matter is before the Court on Defendant's motion for summary judgment.[1] (Doc. 21). For the reasons discussed herein, it is recommended that this motion be DENIED.

### I. BACKGROUND AND FACTUAL ALLEGATIONS[2]

**A. Complaint.**

Plaintiff alleges that while incarcerated in Holman Correctional Facility's C-Dorm on December 2, 2018, he was attacked by several unknown inmates (with knives) while he was asleep at approximately 5:30 P.M. (Doc. 1 at 4). Plaintiff was stabbed 21 times,

---

[1] The Court converted the Defendants' Answers and Special Reports to a motion for summary judgment. (Docs. 19, 20).

[2] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riveria Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

sustaining injuries necessitating being air lifted to a hospital for medical treatment.[3]

Plaintiff alleges no officer was in C-Dorm at the time he was attacked, and Plaintiff had to shake the bars to get the Cubicle Officer's attention to be let out of the dormitory gate, where he was met by officers and escorted to the health care unit. Plaintiff alleges he is permanently disabled from the attack.

Plaintiff is suing Warden Cynthia Stewart for "a lack of security" at Holman and requests relief in the amount of one million dollars. (Doc. 1 at 7).

**B.    Defendant's Answer and Special Report.**

Defendant Stewart has answered the suit and denied the allegations asserted against her. In support of her denial, Defendant Stewart has submitted a personal affidavit in response to the allegations asserted against her, which is summarized as follows:

Warden Cynthia Stewart avers that she is employed as Warden III of Holman since November 1, 2010. She avers that she was not present at Holman on December 2, 2018 when the incident occurred. She further avers that she is not responsible for the hiring process or the appointment to fill the position of correctional officers. She further avers that "[a] review of the post assignment for the day in question reflects there were adequate number of staff on duty to provide security for the dorms in population." (Doc. 20-1).

Defendant has also submitted the December 2, 2018 Incident Report (Doc. 20-2 at 2-3)[4] which indicates that at approximately 5:30 P.M., Cubicle Officer Holloway called

---

[3] Plaintiff alleges that assault incidents occurred in both C-Dorm and A-Dorm on December 2, 2018, causing multiple injuries, including the death of one inmate. (Doc. 1 at 5). It is unclear from the complaint if these incidents are related to one another. It is undisputed that at least two other inmates were injured (stabbed) in the assault incident complained of by Plaintiff in the complaint (*See* Doc. 20-2 at 2-7) and that a Code Red was called in A-Dorm at 6:00 p.m., approximately 30 minutes after Plaintiff was attacked. (*See* Doc. 20-2 at 11).
[4] Defendant has also submitted a Duty Officer Report which corresponds to the information provided in the Incident Report. (See Doc. 20-2 at 7).

a code in C-Dorm, to which Captain Emberton, Sergeant Pace, Officer Kelly and Officer Mitchell responded. The correctional officers observed Inmate Thomas bleeding from his back as he came around Cubicle 2. Officers Kelly and Mitchell escorted Inmate Thomas to the health care unit. The nursing staff determined Inmate Thomas needed to be transported by ambulance for further treatment at an outside hospital.[5] Inmate Thomas was transported via ambulance to a helicopter and was air lifted to USA Hospital. No crime scene or weapon was found, and no suspect attackers were identified. Inmate Thomas returned to Holman on December 5, 2018 and was placed on the hospital ward. (Doc. 20-2 at 2-3).

The body chart following the incident reflects that Plaintiff was evaluated at 4:47 P.M. by Nurse D. Simmons (Doc. 20-2 at 6) who noted that plaintiff received "multiple stab wounds" on upper and lower back. (*Id*.). The chart further confirms that Plaintiff was sent via ambulance to USA Medical Center.

Defendant has also put forth the Post Assignment Roster and the Duty Post Log for December 2, 2018. The Post Assignment Roster reflects 24 "B-Shift Days" officers were present at Holman on December 2, 2018. (Doc. 20-2 at 14). The Duty Post Log reflects 16 "B-Shift Days" officers were present at Holman at the time of the incident subject of this complaint. (*Id*. at 8).

---

[5] While Plaintiff was receiving treatment in the health care unit, Cubicle 2 Officer Wright radioed that Inmate Bailey, in C-Dorm, was bleeding and that Inmate Bailey had exited C-Dorm. (Doc. 20-2 at 2). Inmate Bailey was apprehended in D-Dorm by Captain Emberton and Sergeant Pace and was brought to the health care unit for evaluation. (*Id*.; see also 20-2 at 4). It was determined that Inmate Bailey was attacked at the same time as Inmate Thomas. (Doc. 20-2 at 2). At 5:50 P.M., Inmate Mims was also let out of C-Dorm after being assaulted following an argument with inmates related to Inmate Thomas being stabbed. (Doc. 20-2 at 2, 5). Inmates Bailey and Mims were processed into the Restrictive Housing Unit pending investigation of the incident. (Doc. 20-2 at 2).

3

The Court converted Defendant's answer and special report (Docs. 19, 20) into a motion for summary judgment. (Doc. 21).

**C.** **Plaintiff's Response to Defendant's Motion for Summary Judgment.[6]**

Plaintiff articulated factual descriptions of violence, overcrowding, and understaffing at Holman in his response to Defendant's motion. Specifically, Plaintiff provided that defendant Stewart was warden at Holman in 2016, when an inmate killed Officer Bettis with a prison made knife ("over some french fries"). (Doc. 24 at 1). Plaintiff stated that in the month of September 2016, 236 inmates were stabbed with prison made knives, and between the years of 2016-2020, 2-3 inmates were stabbed per day in Dormitories A-D. (*Id.*). Plaintiff claims that each of the Holman dorms are designed for 50 inmates but house 115 inmates. (*Id.*). He further describes conditions of overcrowding, stating: (1) after Officer Bettis was killed in 2016, 15 ADOC officers quit, leaving the prison

---

[6] On December 2, 2020, this court converted Defendant's answer and special report into a motion for summary judgment. (Doc. 21). Plaintiff was ordered to file a response to the motion by January 4, 2021. Plaintiff responded, (1) informing the Court of his desire to continue the litigation, (2) requesting an extension of time to respond to the motion, (3) alleging the submitted Duty Post Roster Logs were for December 12, 2018 instead of December 2, 2018, and (4) requesting production of documents (namely medical records). (Doc. 22). On January 8, 2021, Plaintiff was granted a 30-day extension to file his response to the motion (although his discovery request was denied for failure to establish relevance to his claim). (Doc. 23). On February 4, 2021, Plaintiff filed a document titled Motion for Leave to Amend the Complaint to Conform to the Evidence. (Doc. 24). This document appears to be sent in response to the motion for summary judgment and consists of allegations of general violence, overcrowding, and understaffing. The factual details appear to be in direct response to Defendant's allegations and in support of Plaintiff's "lack of security" claim. For this reason, the Court interprets Plaintiff's Motion for Leave to Amend and the facts set out in it as Plaintiff's response to Defendant's motion for summary judgment. (*See* Doc. 24); *see Fernandez v. United States*, 941 F.2d 1488, 1491 (11th Cir.1991) (*Pro se* pleadings must be read liberally to determine "whether jurisdiction to consider[them] can be founded on a legally justifiable base."); *United States v. Jordan*, 915 F.2d 622,624–25 (11th Cir.1990) (The Court has an "obligation to look behind the label of a motion filed by a *pro se* inmate and determine whether the motion is, in effect, cognizable under a different remedial statutory framework.").

more understaffed at 17 %; (2) the nightshift is typically manned by 6-10 officers watching 900+ prisoners; and (3) correctional officers are not placed in the dorms at night due to understaffing. (*Id*. at 2-3).

Plaintiff explains that due to the high number of inmate-on-inmate stabbings, Warden Stewart ordered the officers, "not to enter any dorm during inmate violence". (Id. at 2). This order particularly applied to the 6 PM to 6 AM shift; Plaintiff described,

> During this shift, it was common for the officers to watch inmate on inmate stabbings taking place and for them to stand outside the gate and just watch. Officers refused to use there[sic] pepper sprayer nightsticks to break up or separate inmate combatants or inmate victims from the perpetrators.

(*Id*. at 2). He further maintains that while the Alabama Department of Corrections CERT officers (CERT team) are ordered "to man Holman or augment Holman security staff during the 6AM-6PM shift for 5 days every week for three weeks in a month" (typically arriving at 10 AM and leaving the prison every day at 4:30-5:00 PM), "[a]t no time from 2016-2020 has the nightshift been augmented by CERT team members. (*Id*.). Plaintiff claims that if the CERT team was employed at night, when the violence ramps up and security and staff are most needed, then he would not have been stabbed. (*Id*. at 4).

In his response, Plaintiff alleges that on the night he was stabbed, a Sunday evening, two cubicle officers were responsible for watching two dorms on the opposite side from the cubes and controlling the gates into and out of the dorms. (*Id*.). Officers Mitchell and Kelly, assigned as Rovers, were responsible for covering two dorms a piece, with each dorm housing 125 inmates. Plaintiff contends "Mitchell and Kelly were the only two officers assigned to rove within the dorms which they did not do due to Stewart's orders." (*Id*.). Thus, with the other officers on duty being assigned to various locations (including, towers, kitchen, visitation, etc.), these two officers, Mitchell and Kelly, were

5

obliged to watch 450-500 inmates. (*Id*.). Plaintiff alleges Defendant Stewart is responsible for his attack due to her "severe understaffing", which "created a severely undermanned environment w[h]ere inmate on inmate violence was a foreseeable and predictable outcome. If any Code was called, only two officer[sic] could respond and they were not allowed to enter the dorms." (*Id*.). Plaintiff maintains if Defendant Stewart had "utilized the CERT at night and on the weekends", he would not have been stabbed. (*Id*.).

## II. MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis in original); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis in original) (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence showing there is

6

no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.'" Id. (citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id*. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such

that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

### III. DISCUSSION AND ANALYSIS

#### A. IMMUNITY DEFENSES.

To the extent Plaintiff attempts to sue Defendant in her official capacity (as the correctional warden of a state prison) and seeks any type of monetary award, the defendant is entitled to absolute immunity from suit, as official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Id.*, quoting in large measure *Lancaster v. Monroe Cnty*, 116 F.3d 1419, 1429 (11th Cir. 1997). Accordingly, Defendant Stewart, employed by the State of Alabama, is entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429.

As to the allegations asserted against Defendant in her individual capacity, Defendant asserts that she is entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Marbury v. Warden,* 936 F3d

1227, 1232 (11th Cir. 2019) (citation omitted). Since there is no dispute that Defendant Stewart was acting within her discretionary authority at all times when the acts in question occurred, the burden shifts to Plaintiff to show that Defendant violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id*. Therefore, the Court will now address whether this action identifies any constitutional violation.

### B. EIGHTH AMENDMENT FAILURE TO PROTECT.

"The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison." *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003); *see also Bass v. Perrin*, 170 F.3d 1312, 1316 (11th Cir. 1999). The Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "'[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (some internal quotation marks omitted). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981). Additionally, "[b]eyond just restraining prison officials from inflicting 'cruel and unusual punishments' upon inmates, '[t]he Amendment also imposes duties on these officials, who must ... "take reasonable measures to guarantee the safety of the inmates."'" *Bowen v. Warden Baldwin State Prison,* 826 F.3d 1312, 1319-20 (11th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811

9

(1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

Under the Eighth Amendment, prison officials have a duty to "ensure reasonable safety" of inmates, "a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844-845. However, "a prison custodian is not the guarantor of a prisoner's safety", *Purcell ex rel. Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted), and "[i]t is not[] every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Prison officials must "take reasonable measures to guarantee the safety of the inmates", *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984), but there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not. . . ." *Farmer*, 511 U.S. at 838. It is a defendant's deliberate indifference to a known, significant risk that violates the Eighth Amendment. *Lane v. Philbin*, 835 F. 3d 1302 (11th Cir. 2016).

To establish a § 1983 claim for deliberate indifference, Plaintiff must show (1) "that he is incarcerated under conditions posing a substantial risk of serious harm", *Farmer*, 511 U.S. at 534; (2) that the defendants' were deliberately indifferent to that risk, acting with a "sufficiently culpable state of mind", *id.;* and (3) causation. *Lane*, 835 F.3d at 1307. The first, objective, element requires the plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Lane*, 835 F. 3d at 1307. The second, subjective, element requires showing that the official was both "aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he . . . also draw the inference." *Farmer*, 511 U.S. at 837. Again, it is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. *See, e.g., Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed 2d 251 (1986). "The known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*

Plaintiff is suing Defendant Stewart for acting with deliberate indifference to his safety by creating a severely understaffed environment in an overcrowded prison, making "inmate-on-inmate violence a foreseeable and predictable outcome." (Doc. 24 at 4). Specifically, Plaintiff claims Defendant Stewart ordered that officers not enter dorms to intervene in inmate attacks and implemented a policy to not staff CERT team officers on the night shift or weekends, leading to his attack. Accordingly, read liberally, Plaintiff asserts an Eight Amendment claim for a generalized risk of harm faced at Holman prison. Defendant Stewart, as the movant to this motion, now bears the burden of showing there is no genuine dispute as to any material fact or that Plaintiff has failed to present evidence to establish his deliberate indifference claim. She asserts that, contrary to Plaintiff's allegations, the prison was adequately staffed at the time of the incident subject of the

11

complaint,[7] and Defendant points to "the post assignment for the day in question" to support that "there were adequate number of staff on duty to provide security for the dorms in population." (Doc. 20-1). Defendant, however, has put forth conflicting evidence, through the Duty Post Log (Doc. 20-2 at 8) and Post Assignment Roster (Doc. 20-2 at 14), regarding the security of Holman's C-Dorm at the time Plaintiff was attacked. While these two institutional documents bear the same date, same shift, and same Shift Commander, the other named officers on the documents and their assigned posts are noticeably different. In support of this motion, Defendant relies on the Post Assignment Roster, which reflects that 24 officers were securing Holman at the time Plaintiff was attacked – four of these officers were CERT members assigned to Dorms A-D. (Doc. 20-2 at 14).

Contrarily, the submitted Duty Post Log (which records the time and details of occurring events on December 2, 2018, from 6AM-6PM) reveals that no CERT team members were present at Holman and two officers, Mitchell and Kelly, secured Dorms A-D. (Doc. 20-2 at 8). It bears mentioning that the Duty Post Log corresponds with the provided Incident Report, as well as Plaintiff's allegations that at the time he was attacked only two officers (Mitchell and Kelly) were "roving" the general population dorms housing approximately 500 inmates. The Duty Post Log also supports Plaintiff's allegation that no officer was stationed inside Dorm-C at the time he was attacked, that no CERT team officers are at the prison on the weekend, and that no officer entered the dorm to intervene

---

[7] If Defendant can show an adequate number of correctional officers securing Plaintiff's dormitory at the time of the attack, she will likely prevail on summary judgment. *See Farmer v. Brennan*, 511 U.S. 825, 844 (explaining that prison officials who know of a substantial risk to inmate safety "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

12

in the attack. Accordingly, Defendant has failed to carry her burden of showing that the record lacks a genuine issue of material fact nor has she demonstrated that Plaintiff has failed to establish an element of his claim as discussed below.

The Eleventh Circuit has declared many times over that a claim for a generalized risk of violence may only be established by showing "that serious inmate-on-inmate violence was the norm or something close to it" which is generally evidenced by "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Marbury v. Warden*, 936 F.3d 1227, 1234-35 (11th Cir. 2019) (internal citations omitted) (evidence of witnessing 15 stabbings showed "some risk of harm" but was insufficient to show a "substantial risk of serious harm").

In *Hale v. Tallapoosa County*, the Eleventh Circuit determined that a prisoner survived summary judgment that inmate-on-inmate violence created a substantial risk of serious harm by submitting evidence that prisoners were not segregated based on their proclivity for violence, there was only one jailer on duty, the jailer's quarters were out of earshot and eyesight of the prisoners' cell, and fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization. 50 F.3d 1579, 1581-84 (11th Cir. 1995).

In *Marsh v. Butler County, Ala.*, 268 F.3d 1014 (11th Cir. 2001) (en banc), the Eleventh Circuit held that the former inmate plaintiffs alleged sufficient facts to survive summary judgment when they claimed:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates

> with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.

*Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1029 (11th Cir. 2001). The Court reasoned that, "[t]aken as a whole, these alleged conditions, if true, present an objectively substantial risk of serious harm—including the risk of inmate-on-inmate attacks—to inmates. This risk violates the Eighth Amendment's requirement "that inmates be furnished with basic human needs, one of which is 'reasonable safety.'" *Id*. (quoting *Helling v. McKinney,* 509 U.S. 25, 113 S. Ct. 2475, 2480–81, 125 L. Ed. 2d 22 (1993) (internal citation omitted).

The Eleventh Circuit has specified that *Hale* and *Marsh* are not the "proverbial 'floor' of liability for Eighth Amendment purposes" but that the standard is whether the conditions evidence by the records are "sufficiently grave to violate the Constitution." *Purcell ex rel. Estate of Morgan v. Toombs County, Ga*., 400 F. 3d 1313, 1323 (11th Cir. 2005) ("Whether a substantial risk of serious harm exists so that the [Constitution] might be violated involves a legal rule that takes form through its application to facts.").

It is undisputed that Defendant Stewart was not present at the time of the incident. And, Plaintiff has not alleged any facts suggesting that Defendant subjectively knew that the inmates who attacked Plaintiff were a known threat to his safety. Therefore, to

14

establish liability on the part of Defendant, Plaintiff must show a causal connection linking her actions to the alleged constitutional violation. *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) ("Supervisory liability under section 1983 may be shown either by the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation.").

> The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, __ F.3d at __, 2003 U.S. App. LEXIS 5762, 2003 WL 1481583, at *5 (quoting *Braddy v. Fla. Dept. of Labor & and Employment*, 133 F.3d 797, 802 (11th Cir. 1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy . . . result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, __ F.3d at __, 2003 U.S. App. LEXIS 5762, 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, __ F.3d at __, 2003 U.S. App. LEXIS 5762, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

*Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999) (quotations omitted).

Here, Plaintiff has sufficiently alleged a history of widespread inmate-on-inmate abuse – that is 2-3 inmate stabbings in Dorms A-D daily from 2016-2020, 236 inmates stabbings in one month (September 2016) - and that Defendant Stewart knew about it.[8]

---

[8] Stewart has affirmed that she was the warden at Holman during these asserted time periods.

With knowledge of the prison's violence, Plaintiff has alleged that Defendant Stewart severely understaffs the prison (especially at night and on weekends, with approximately 6-10 officers securing approximately 900 inmates).[9] Plaintiff has also shown that at the time he was attacked, only two officers were "roving" the general population dorms; thus, two officers were responsible for securing and supervising nearly 500 inmates, in four dormitories that they did not enter. Moreover, Plaintiff alleges that Defendant has ordered the officers "not to enter any dorm during inmate violence" and that it is common, especially during the nightshift, "for the officers to watch inmate on inmate stabbings taking place and for them to stand outside the gate and just watch", refusing to intervene to break up the fights. (Doc. 24 at 2). These allegations, if true, are sufficient under *Marsh* and *Hale* to establish a supervisory official's deliberate indifference to an inmate's constitutional rights, as they evidence a "strong likelihood of injury". *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). Stated another way, Plaintiff has alleged specific features of Holman that render it particularly violent, i.e., overcrowding, failure to supervise inmates, failure to break up fights, and the failure to limit knives. *Cf., Marbury*, 936 F.3d at 1235 ("[A] generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm" where a "plaintiff has pointed to specific features of a facility or its population rendering it particularly violent").[10]

---

[9]     *See Laube v. Haley*, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002) (noting "there is nothing inherently wrong with having only a few staff members supervise inmates.").

[10]     Notably, prison officials who know of a substantial risk to inmate safety "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844. Here, however, Defendant Stewart has failed to demonstrate any measures taken to curb the violence, limit inmate

16

In that *Hale* was decided twenty-five years ago and *Marsh* nineteen years ago, Defendant Stewart had "fair warning" that her alleged failure to correct overcrowding, limit contraband weapons, and inadequate security, which resulted in inmate-on-inmate abuse at the prison, violated a clearly established constitutional right. Similar to those cases, Plaintiff has plead that Defendant knew of substantial numbers of inmate attacks, with knives, and failed to properly staff the prison with guards (namely CERT team members) that could adequately secure the inmates. He further contends that she instructed the officers not to enter the dorms to stop a fight or inmate attack while it is ongoing. These policies resulted in deliberate indifference to a substantial risk of harm to Plaintiff in violation of the Eighth Amendment. Thus, at this early stage of the action, taking Plaintiff's allegations as true which are not blatantly contradicted by the record, Defendant Stewart is denied qualified immunity and summary judgment.

### C. CONCLUSION.

Based on the foregoing, the undersigned recommends that summary judgment should be **DENIED**.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

---

access to weapons, or supervise the inmates. Instead, Defendant Stewart simply avers that she is not the party responsible for hiring correctional officers and that "the post assignment for the day in question reflects there were adequate number of staff on duty to provide security for the dorms in population." (Doc. 20-1). To the latter, the undesigned disagrees - as the record before the court reveals conflicting information as previously discussed.

17

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. GenLR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object.  In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 30th day of March, 2021

                                                     s/P. Bradley Murray
                                                   UNITED STATES MAGISTRATE JUDGE